[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff brought this complaint alleging the following: (1) non-payment of rent; (2) failure to leave the house in good and clean condition; and (3) failure to repair the damage as required by the lease.
The defendant filed a three-count counterclaim alleging the following:
1. (a) failure to place the security deposit in an escrow account in a financial institution, in the State of Connecticut, in violation of C.G.S. § 47a-21 (h);
(b) failure to pay interest in violation of C.G.S. § 47a-21 (j); and
(c) failure to pay security deposit plus interest within thirty days of termination of the tenancy in violation of C.G.S. § 47a-21 (d);
2. the plaintiffs failure to comply with the statutory requirements as to the security deposit is a violation of Connecticut Unfair Trade Practices Act (CUTPA), C.G.S. § 42-110a et seq.; and
3. the plaintiffs failure to resolve a foreclosure matter caused a continuing loss of peaceful use and enjoyment of the premises and his legal fees incurred to protect his interest in the leased property.
The plaintiff asserted the following defenses to the counterclaim:
1. As to Count 1, the security deposit was placed in an interest bearing account and the security deposit plus interest was retained pursuant to C.G.S. § 47a-21 (d) as there was a good faith claim for damages;
2. As to Count 2, the CUTPA claim is baseless as the plaintiff acted in good faith;
3. As to Count 3, the plaintiff had informed the defendant that his right to peaceful enjoyment was not in jeopardy and he did not need to assert a defense. Furthermore, a party to a lawsuit is generally not CT Page 8278 entitled to attorney's fees and costs.
 DISCUSSION
After a trial and an assessment of the credibility of the witnesses, the Court finds the following:
The plaintiff Evelyn Matles and the defendant entered into four written lease agreements.[1] The first one started September 1, 1995 and ended August 31, 1996. The last written lease agreement started September 1, 1998 and ended September 1, 1999. The defendant paid a security deposit in the amount of $1,300.00 in 1995.
Within two months of moving in, the defendant had set up an office in the house. He hired employees and expanded his financial services business, which he operated from the subject premises.
The defendant moved out between Memorial Day weekend in May and the middle of June 1999, prior to the end date of the lease.
UNPAID RENT
The plaintiff is seeking unpaid rent for the months of June, July and August 1999. paragraph #10 of the lease agreement[2] required the defendant (tenant) to notify the plaintiff (landlord) in April of 1999 if the lease was to terminate as of September 1999. This lease also required the plaintiff (landlord) to notify the defendant (tenant) in April in the year the house would be sold.
In the lease the year 1998 is stated. However, the lease was signed September 1, 1998 and at trial all references were made to the year 1999. Obviously 1998 is a scrivner's error.
The plaintiff sent a letter to the defendant dated April 9, 1993[3]
in which she referenced issues that she had discussed with the defendant. The letter also included her expectation that the defendant would pay rent through to the end of the lease.
Paragraph #10 of the lease required the defendant to give notice, in April, if he would not be staying beyond September. The defendant notified the plaintiff, by letter dated June 1, 1999[4], that he intended to vacate the premises on June 30, 1999, two months prior to the end of the lease term. The defendant also requested the plaintiff to return the two post-dated checks that he had issued for the months of July and August 1992. CT Page 8279
The defendant had previously issued a check for the rent for the months of June. The plaintiff had deposited that check. The defendant then placed a `stop payment' on the check. The bank charged a fee in the amount of $5.00 for the returned check.
The defendant admitted that he failed to pay rent for the months of June, July and August 1999. He believed that he did not have to pay because he had moved out. Based on the terms of the lease, the testimony and letters offered at trial, the Court finds that the defendant owes the plaintiff unpaid rent for the months of June, July and August 1999 in the amount of $3,900.00 (3 x $1,300.00). The defendant also owes the plaintiff for the returned check fee in the amount of $5.00.
INTEREST
The plaintiff is seeking interest on the amounts owed for unpaid rent. Paragraph #12 of the lease provides for payment of interest at the rate of twelve percent per year. However, C.G.S. sec. 37-3a provides that interest may be recovered in a civil action, at the rate often percent and no more.
The defendant owes the plaintiff ten percent interest on the unpaid rent from October 1999 to March 20, 2002 in the amount of $1,074.30.
DAMAGES TO THE PREMISES
The plaintiff has alleged that the defendant failed to leave the premises in good and clean condition and failed to repair any damage he caused. The plaintiff is also seeking reimbursement for missing items.
The party seeking damages must prove the damages.
In Paragraph #3 of the lease the defendant had agreed to use the house as a dwelling and not to destroy or damage any part of the house or any of the furnishing or appliances (Paragraph #5).
In Paragraph #10 of the lease the defendant agreed not to make any changes without the plaintiffs permission and if that permission is granted, any items installed become the plaintiffs property, but the defendant may use them until the lease ends.
The defendant admitted that he did make some changes and cause some damage. The issue presented is how extensive was that damage and how much the defendant should pay for restoring the premises to the condition at move-in. CT Page 8280
The defendant admitted that in 1995, immediately after he moved, he started making changes in the house. By the end of the second year he had completed all the changes.
According to the statements made by the plaintiff and the defendant, and the exhibits submitted[5], the plaintiff at some point became aware that the defendant was operating a business out of the house. Furthermore, the plaintiff did not challenge the defendant's statement that he understood that he should pay the rent, keep a low profile and not trash the house.
Although the plaintiff knew that the defendant was operating a business out of the house, the Court is not persuaded that she was aware of the scope of the business and the extent of the changes the defendant had made in order to accommodate his growing business.
The defendant admitted that in 1995, immediately after he moved in, he hired Daniel Skaparos to make some of the changes in the house. Mr. Skaparos had been a general contractor for sixteen years. He had previously worked for the defendant's parents and he had also worked in the defendant's business as a telemarketer.
Mr. Skaparos stated that he had worked on the house for five or six days. He made some changes including the following: he replaced the blinds, helped roll out the carpet, replaced a latch which cost $2.00, installed furniture including two or three TV stands and helped hang pictures. Mr. Skaparos also removed two or three wooden doors and replaced them with accordion style doors. He placed the doors in the basement and agreed that wood warps when kept in a damp location, such as a basement.
The defendant also hired Stan Rice to make some further changes in the house. Mr. Rice was a ceramic tile setter for forty-six years. He had been to the house at least three times and replaced the tile in the bathroom, kitchen and the hallway. He stated that the floor he replaced was between twenty to thirty years old and the tiles had not been well attached. He believed that the correct cement had not been used when the floor was first installed.
Mr. Rice described the floor as old and piquing. It's color was dull gray and it had some sculpture in it. The floor curled because the tiles had lost their oil over time. Mr. Rice was emphatic that the kitchen floor he replaced was gray and not the floor in the photograph of plaintiffs exhibit. Mr. Skaparos had also stated that the kitchen had faded gray tiles.
The defendant stated that he had the vinyl tiles replaced with ceramic CT Page 8281 tiles because they were buckling. The defendant admitted to making additional changes that included the following: he removed the `old' carpet in the dining room and threw it out. This `old' carpet was appraised to be a hand made wool oriental rug, approximately eighty years old, and valued at $650.00[6] The defendant did not ask for permission nor did he inform the plaintiff that he was going to remove the carpet.
In the last one year lease, in paragraph #10, the defendant agreed to the removal of the blue and green carpet that he had placed in the dining room and on the staircase and the replacement in a neutral color.
The defendant had cable, phone jacks and other electrical wiring installed. He had holes drilled into the baseboard and the stucco to allow cable connection for the computers. His Internet access was through the television. The defendant admitted that he had authorized the removal of the wooden doors and the installation of the accordion style doors. He stated that he removed the venetian blinds and threw them away and that he had new ones installed in colors more to his liking.
The plaintiff also claimed that some items were missing. Specifically, bedroom fixtures, an old rotary phone and an antique metal table which the defendant thought was made of wood. The defendant admitted that the items were there when he moved in but had no knowledge as to their disappearance.
Paragraph #23 of the lease prohibited pets except fish/turtles. The defendant admitted that he brought his parents' dogs to the house (a Boston terrier and a bulldog). These dogs were not house broken and they damaged the kitchen walls.[7] The defendant erected a chicken wire fence around the deck because the dogs had been digging up the back yard.
Finally, the defendant admitted to pulling some paint off the walls when he tried to remove some plastic tape, and that one of the doors was trashed when he moved out.
Robin Gebrian, the rental agent for the house, was very familiar with the house. She had inspected the house before the defendant moved in and the day after the defendant moved out. Ms. Gebrian observed the changes that the defendant had made, including the tile that had been placed over the parquet floor leading to the kitchen, the chicken wire attached to the deck, and that the yard was in "poor repair".
The plaintiff and the defendant had had "rolling conversations" about the rent and the damage to the house. The defendant moved in with one computer. Two months later he hired Michael Desilet. At the time of this CT Page 8282 hire, he had three computers, which Mr. Desilet helped set up. By the time the defendant moved out, he had two employees and eleven phone lines at the house.
The plaintiff planned on selling the property and did so in November 1999. As early as April 1999, she had started on the plans to get the house ready for sale. The plaintiff had new kitchen cabinets installed by Home Depot. These had to be removed and replaced because of improper installation.
Some of the items claimed for reimbursement are for expenditures that the plaintiff would have had to make in preparing the house for sale. These include some of the painting, the home analysis and replacement of the screen door, which was approximately nine years old. Additionally, some of the damages claimed cannot be attributed to the defendant such as the chimney repair.
The plaintiff submitted estimates and bills, Some were duplicates and some were estimates where the work had not been done.
Base on the above the plaintiff has allowable damages in the amount of $8,815.24.[8]
The parties had agreed that the security deposit would be used for replacement of the carpet in the dining room and on the stairs. The plaintiff retained the security deposit for that purpose. The defendant is entitled to a credit in the amount of $1,516.35.[9]
The plaintiff is entitled to damages in the amount of $7,298.89.
Judgment for the plaintiff in the amount of $12,278.10.[10]
ATTORNEY'S FEES
Each party to litigation must bear his or her own litigation costs, including attorney's fees, unless an attorney's fee award is authorized by lease or statute. Gino's Pizza of East Hartford, Inc. v. Kaplan,193 Conn. 135, 475 A.2d 305 (1984). Paragraph #12 of the lease authorizes attorney's fees equal to fifteen percent (15%) of the amount of the judgment.
The plaintiff is awarded attorney's fees in the amount of $1,841.68.
 COUNTERCLAIM
SECURITY DEPOSIT
CT Page 8283
C.G.S. § 47a-21 (h) states that a security deposit must be held in an escrow account m a financial institution. The defendant argues that the deposit was not kept in an account in a financial institution in the State of Connecticut. The defendant does not dispute the fact that the funds were held in an interest bearing account.[11] The plaintiff held the funds in an interest bearing checking account and that is in compliance with the statute.
The defendant did not present any evidence as to any complaint in the counterclaim pursuant to C.G.S. sec. 47a-24 (j).
C.G.S. § 47a-21 (d) requires a landlord, at the time a tenancy is terminated, to return the security deposit plus interest, less the value of any damages as a result of the tenant's failure to comply with such tenant's obligations.
In this case the defendant notified the plaintiff by letter dated June 1, 1999 that he would be vacating the premises at the end of June, two months before the end of the lease term. He was required to provide notice, in April, if not staying beyond September. The defendant has admitted that he failed to comply with his obligations in the lease. Specifically, the defendant, by setting up a business in the house, "building out" the house to accommodate his business, and having two dogs in the house, failed to comply with Paragraph #s 3, 5, 8, 10 and 12 of the lease.
The defendant argues that C.G.S. § 47a-4 prohibits the waiver of a claim for the return of the security deposit. However, C.G.S. § 47a-21
(d) permits a landlord to withhold the security deposit for damages. In Paragraph #10 of the last lease the defendant agreed that the plaintiff may use the security deposit to replace the blue and green carpet that he had installed after he moved in. The defendant has also admitted to causing damage to the premises when he modified the house to accommodate his business.
The plaintiff provided the defendant with notice of the claimed damages[12] as required by C.G.S. 47a-21 prior to him moving out. The damages far exceeded the amount of the security deposit plus interest therefore the plaintiff is permitted to retain the security deposit.
Judgment for the plaintiff on Count 1 of the counterclaim.
CUTPA
The defendant alleges a violation of the Connecticut Unfair Trade CT Page 8284 Practices Act, C.G.S. § 42-110g et seq. In determining whether a practice violates CUTPA, we use the criteria of whether it offends public policy or comes within some established concept of unfairness, whether it is immoral, unethical, oppressive or unscrupulous, or whether it causes substantial injury to consumers, competitors or other businessmen. Munizv. Kraus, 59 Conn. App. 704, 713, 757 A.2d 1207 (2000).
All of the criteria need not be satisfied to support a finding of unfairness, and the practice may be unfair because of the degree to which it meets some of the criteria, or because to a lesser degree it meets all . . . Atlantic Ridgefield Co. v. Canaan Oil Co., 202 Conn. 234, 242
(1987). A single real estate transaction may be the basis for a CUTPA claim. Oat v. White, 5 Conn.L.R. 229 (1991).
The plaintiff had leased the premises to law students prior to the four consecutive one-year leases with the defendant. The plaintiff therefore by leasing the premises is considered to be in the conduct of trade or commerce. The defendant claims that the plaintiff's conduct as alleged in the first court of the counterclaim was unfair and sufficient for a CUPTA violation.
In this case, the plaintiff vacated the premises prior to the end of the lease term. Immediately after starting occupancy the defendant "built out" the house to accommodate his business and then expanded that business. He caused damage to the house including the installation of electrical outlets and jacks, removal and replacement of doors and throwing out an oriental rug valued at $650.00.
The plaintiff and the defendant had agreed that the security deposit may be retained to defray the cost of the damage as to the carpet. Furthermore, the security deposit was held in an interest bearing account.
The actions of the plaintiff under the facts and circumstances of this case, do not constitute a CUTPA violation. As there is no CUTPA violation, no punitive damages or attorney's fees are awarded.
Judgment for the plaintiff as to Count 2 of the counterclaim.
LOSS OF PEACEFUL USE AND ENJOYMENT
The defendant claimed that he had lost the right to peaceful use and enjoyment because the plaintiff failed to resolve a foreclosure matter. The defendant was named in the foreclosure action of Wilshire CreditCorporation v. Evelyn Matles. The mere institution of a foreclosure action by a landlord's mortgagee does not . . . lead to the tenant's CT Page 8285 dispossession. Collins v. Sears Roebuck and Co., 164 Conn. 369, 376-77,321 A.2d 444 (1973).
It was undisputed that the plaintiff informed the defendant that he had nothing to worry about as to the foreclosure. The defendant admitted that he entered into a new written lease after he was aware of the foreclosure action. The plaintiff sold the house on November 5, 1999[13] leading to a reasonable inference that she retained title until the date of the sale.
Since the defendant continued to occupy the premises, signed a new lease, and continued to operate his business, the court finds that under the facts of this case there was no loss of peaceful use and enjoyment of the premises.
Judgment for the plaintiff on the third count of the counterclaim.
 CONCLUSION
Judgment for the plaintiff as below:
1. The defendant Fraser Allport failed to pay rent pursuant to the lease for the months of June, July and August 1999 in the amount of $3,900.00 (3 x $1,300.00). As a result of a stop payment placed on the check issued for rent for the month of June, the plaintiff Evelyn Matles was charged a $5.00 fee for the returned check. The defendant owes the plaintiff $3,905.00.
2. Paragraph #12 of the lease authorized interest on any past due amounts. The defendant owes the plaintiff interest at the rate of ten percent in the amount of $1,074.30.
3. The defendant caused damage to the premises when he modified the residence to accommodate his business. The plaintiff is entitled to damages in the amount of $8,815.24 minus $1,516.35 (credit for security deposit plus interest.) for a net amount of $7,298.89
4. The plaintiff is awarded judgment in the amount of $12,278.19
5. In accordance with Paragraph #12 of the lease the plaintiff is awarded attorney's fees in the amount of $1,841.68, fifteen percent of the judgment.
6. The defendant failed to meet his burden of proof as to the counterclaim. Judgement for the plaintiff on all three counts of the counterclaim. CT Page 8286
 ORDER
The defendant is ordered to pay to the plaintiff $14,119.87[14]
 ___________________ Juliett L. Crawford Superior Court Judge